******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

LINDA SOBIN, ADMINISTRATRIX (ESTATE
OF PETER SOBIN), ET AL. *v.*
ORTHOPAEDIC SPORTS
SPECIALISTS, P.C.
(AC 46510)
(AC 46730)

Elgo, Suarez and Westbrook, Js.

*Syllabus*

The defendant appealed from the trial court's judgment for the plaintiffs, L in her individual capacity and as administrator of the estate of her deceased husband, P, on their claims for wrongful death due to medical negligence and loss of consortium in connection with P's death from a pulmonary embolism that occurred during his recovery from knee replacement surgery performed by an employee of the defendant. The defendant claimed, inter alia, that the court improperly failed to grant a mistrial based on the allegedly inflammatory and unduly prejudicial examination of B, a key witness, by the plaintiffs' counsel. The plaintiffs filed a separate appeal from the court's partial grant of their motion for offer of compromise interest, and the defendant cross appealed. The plaintiffs claimed that the court improperly declined to award offer of compromise interest with respect to L's loss of consortium damages, and the defendant claimed that the court should not have awarded any offer of compromise interest because the purported offer of compromise was invalid. *Held*:

The trial court did not abuse its discretion in declining to strike the responses of the plaintiffs' medical expert to certain hypothetical questions asked by the plaintiffs' counsel or to grant any other relief regarding such testimony, as there was ample evidence admitted from which the jury could find the foundational facts underlying the hypothetical questions posed.

The trial court did not abuse its discretion in denying the defendant's motion for a mistrial alleging that the limited examination of B by the plaintiffs' counsel was unnecessarily inflammatory and intended to prejudice the jury, as any potential prejudice to the defendant resulting from the challenged questioning of B was satisfactorily dissipated by the court's clear and concise curative instruction.

This court dismissed as moot the defendant's claim that the trial court improperly precluded its medical expert from providing certain opinion testimony, the defendant having failed to challenge all three independent grounds for precluding such testimony.

The trial court properly instructed the jury that, in assessing the damages to award for wrongful death, the jury could award damages for P's death

itself, as the instruction was supported by the model civil jury instructions and case law, and, even if the defendant were correct that the court's instruction was improper, the defendant failed to demonstrate any harm.

The trial court properly denied the plaintiffs' motion for offer of compromise interest with respect to L's loss of consortium damages, as L was not named as a party to the offer of compromise in her individual capacity, nor was it signed by her or on her behalf, and, given the punitive nature of the offer of compromise statute (§ 52-192a), it was appropriate to strictly construe any such offers and it would be untenable to penalize a defendant for not agreeing to an offer of compromise with respect to a cause of action that was never mentioned in the offer of compromise and in favor of a party that was not a party to the offer.

The trial court properly granted the plaintiff's motion for offer of compromise interest with respect to the wrongful death damages, the defendant having cited no appellate legal authority that an offer of compromise is rendered invalid if, in addition to agreeing to settle the matter for a sum certain, it also includes an alternative offer to reach a stipulated judgment, and such a result was not mandated by any language in § 52-192a.

Argued January 9—officially released September 2, 2025

*Procedural History*

Action to recover damages for, inter alia, wrongful death, and for other relief, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Rosen, J.*; thereafter, the court, *Rosen, J.*, denied the defendant's motion for a mistrial; judgment and verdict for the plaintiffs, from which the defendant appealed to this court; subsequently, the court, *Rosen, J.*, granted in part the plaintiffs' motion to assess offer of compromise interest and rendered judgment thereon, from which the plaintiffs appealed to this court and the defendant cross appealed. *Affirmed.*

*David J. Robertson*, with whom, on the brief, were *Christopher L. Wagner* and *Keith M. Blumenstock*, for the appellant in Docket No. AC 46510 and the appellee-cross appellant in Docket No. AC 46730 (defendant).

*Alinor C. Sterling*, with whom were *Christopher M. Mattei*, and, on the brief, *Colin S. Antaya*, for the appellees in Docket No. AC 46510 and the appellants-cross appellees in Docket No. AC 46730 (plaintiffs).

*Opinion*

WESTBROOK, J. Before us are two appeals and a cross appeal that arise out of an action for wrongful death and loss of consortium brought against the defendant, Orthopaedic Sports Specialists, P.C., by the plaintiffs—Linda Sobin (Sobin) as the administratrix of the estate of her husband, Peter Sobin (Peter), and Sobin in her individual capacity—following Peter's death from a pulmonary embolism that occurred during his recovery from knee replacement surgery.

In Docket No. AC 46510, the defendant appeals from the judgment rendered in favor of the plaintiffs on the jury's verdict awarding $5.5 million in damages for wrongful death due to medical negligence and $3 million in damages for loss of consortium. The defendant claims that the trial court improperly (1) failed to strike certain responses given by the plaintiffs' medical expert in response to hypothetical questions that, the defendant argues, relied on facts not in evidence; (2) failed to grant a mistrial based on the plaintiffs' counsel's allegedly inflammatory and unduly prejudicial examination of a key witness; (3) precluded the defendant's medical expert from testifying regarding the origin and size of the pulmonary embolism; and (4) instructed the jury that it could award damages for Peter's "death itself" in addition to damages for pain and suffering.

In Docket No. AC 46730, the plaintiffs appeal from the judgment of the trial court denying, in part, the plaintiffs' motion for offer of compromise interest. They claim that the court improperly declined to award offer of compromise interest with respect to Sobin's loss of consortium damages. The defendant filed a cross appeal in which it claims that the court should not have awarded *any* offer of compromise interest. In particular, the defendant argues that the purported offer of

compromise was not a proper offer to settle and withdraw the action but an offer to stipulate to a judgment, which, the defendant asserts, rendered it invalid as an offer of compromise.

We disagree with the claims raised by the parties in both appeals and the cross appeal. Accordingly, we affirm the judgments of the court.

The following facts, which the jury reasonably could have found on the basis of the evidence presented at trial, and procedural history are relevant to our consideration of the claims on appeal. On September 15, 2015, Peter, who was sixty-one years old, underwent surgery to replace his left knee. The surgery was performed by Michael E. Joyce, an orthopedic surgeon employed by the defendant. The surgery went well, and Peter was discharged from the hospital on September 17, 2015. The discharge instructions provided to Peter following the surgery advised him that he had the highest chance of developing deep vein thrombosis (DVT), a type of blood clot, in the days and weeks after surgery and that, "[i]f the clot breaks loose and travels to a lung, severe health problems and even death can result." The instructions further provided, inter alia, that he should "call [his] doctor right away if [he had] any of the following: [p]ain, swelling, redness, or warmth in the calf or thigh . . . [i]ncreased swelling in [his] leg . . . [i]ncreased redness, tenderness, or swelling in or around the incision . . . [or] [i]ncreased pain . . . ."

Beginning on September 23, 2015, Peter began to experience pain and swelling in his calf. The next day, Peter told his son that his calf felt "hard" and that he "would kind of wince" if he touched it. Peter told his son that he would have his calf checked by Erik Libby, a physician's assistant (PA) employed by the defendant, immediately after his prescheduled September 25, 2015 appointment with his physical therapist, whose office

shared a waiting room with the defendant. Peter attended his physical therapy session, during which the physical therapist examined the bruising on Peter's leg. The therapist told Peter that the bruising appeared normal and was due to a tourniquet used during surgery; Peter was instructed to continue to use cold therapy on his calf and other bruised areas of his leg and to monitor his calf for any increased tenderness or redness. Following his physical therapy appointment, Peter was seen by Libby. Libby did not order an ultrasound of the calf but told Peter to continue to monitor it. Peter texted Sobin after his appointments and relayed that neither the therapist nor Libby had thought his pain or bruising was abnormal and that Libby had instructed him to "ice the knee and the back of [his] calf."[1]

Between September 25 and 28, 2015, the swelling in Peter's calf worsened. On the morning of September 28, 2015, Peter called the defendant. Later that morning, he saw the physical therapist, who documented that Peter's "calf feels knotty." Peter then saw Libby. Libby again did not order an ultrasound. That same day, the defendant's office ordered a new hydrocodone prescription for Peter.

On September 29 and 30, 2015, Peter's calf continued to be painful and swollen. On October 1, 2015, Peter began to struggle to breathe. He was taken to a hospital, where he died shortly after arrival. According to a post-mortem examination report, the cause of death was

---

[1] Whether Libby saw and examined Peter on September 25, 2015, and again on September 28, 2015, was a hotly disputed issue at trial. During his testimony, Libby denied seeing Peter at all on those dates. In the defendant's response to discovery requests, the defendant did not produce any medical records or notes that memorialized a visit to its office by Peter on those dates. There was, however, circumstantial evidence admitted at trial from which the jury reasonably could have inferred that Libby saw Peter on September 25, 2015, and again on September 28, 2015. This evidence included Peter's communications with Sobin and his sons. The defendant does not challenge on appeal the sufficiency of the evidence with respect to those implicit findings of the jury.

"acute pulmonary thromboembolism in the classic setting of previous surgery and decreased mobility."

The plaintiffs commenced the underlying civil action in September, 2017. The operative revised complaint was filed on April 27, 2018, and contained two counts. Count one was brought against the defendant by Sobin in her capacity as the administratrix of Peter's estate and sounded in wrongful death. Specifically, she alleged that Peter's death was the result of the medical negligence of the defendant in that it had unreasonably and carelessly failed (1) to perform an adequate evaluation of Peter's left knee and leg on September 25 and 28, 2015; (2) to identify a significant change in Peter's left extremity; (3) to perform a venous doppler study or ultrasound of the left leg on September 25 and 28, 2015; (4) to identify the significance of Peter's worsening postoperative pain, swelling, bruising, and redness in his left leg; (5) to identify the importance of the physical therapist having called the defendant's office regarding her concerns about Peter's left leg; and (6) to recognize signs and symptoms of a DVT. Count two was brought against the defendant by Sobin in her individual capacity and sounded in loss of consortium and companionship as a result of Peter's death.

On March 12, 2019, Sobin, in her capacity as the administratrix of Peter's estate, filed an offer of compromise with the court offering to enter into a settlement with the defendant for $1 million. The defendant did not accept the offer.

The court, *Rosen, J.*, conducted a jury trial over nine days in April, 2023. At trial, the plaintiffs' medical expert, Richard Santore, an orthopedic surgeon, testified that Libby had breached the applicable standard of care by failing to send Peter for an ultrasound of his calf when Peter presented with symptoms consistent with a possible DVT on both September 25 and 28,

2015. Moreover, he testified that if Libby had ordered an ultrasound, there was a high degree of probability that Peter would have survived. The jury returned a verdict against the defendant on both counts of the complaint and awarded damages of $5.5 million on the wrongful death count and $3 million on the loss of consortium count. In response to jury interrogatories, the jury found that (1) Libby was negligent because he failed to recognize the signs and symptoms of DVT and failed to order an ultrasound of Peter's leg on both September 25 and 28, 2015; (2) Libby's negligence was a substantial factor in causing Peter's death; and (3) Sobin proved her derivative claim for loss of consortium. The court rendered judgment in accordance with the jury's verdict. The defendant appealed.

The plaintiffs thereafter filed a postverdict motion seeking $4,844,161.52 in offer of compromise interest calculated on the full $8.5 million verdict. The defendant opposed the motion. After a hearing, the court issued an order awarding offer of compromise interest with respect to the wrongful death count only in the amount of $2,484,453.48, which resulted in a total judgment for the plaintiffs of $11,016,583.38. The court also awarded postjudgment interest of 7 percent per annum on the total judgment. The plaintiffs appealed from the court's judgment regarding the offer of compromise interest, and the defendant filed a timely cross appeal. Additional facts and procedural history will be set forth as necessary.

AC 46510

I

The defendant first claims that the trial court improperly failed to strike certain responses Santore gave to hypothetical questions posed by the plaintiffs' counsel during Santore's direct examination. According to the defendant, the questions relied on facts not in evidence.

Specifically, the defendant argues in its appellate brief that, although circumstantial evidence was admitted from which the jury reasonably could have inferred that Peter "*saw*" Libby on September 25 and 28, 2015, "[a]bsolutely no evidence was presented . . . that [Peter] ever *communicated* to [Libby] that he was experiencing calf pain and swelling." (Emphasis in original.) Therefore, the defendant argues, the court should have stricken Santore's testimony to the extent that the hypothetical questions he was asked assumed the existence of such communications. We disagree.

The following additional facts and procedural history are relevant to this claim. As part of their case-in-chief, the plaintiffs offered expert testimony from Santore regarding the applicable standard of care and whether it was breached in the present case. The plaintiffs' counsel asked Santore the following line of questions relevant to the present claim:

"[The Plaintiffs' Counsel]: [O]n September 25th, upon learning of complaint of tenderness in [Peter's] calf, what did the standard of care require [Libby] to do on that day?

"[Santore]: Since the diagnosis of DVT by healthcare providers . . . whether it be a vascular surgeon, an orthopedic surgeon, a PA, or a nurse practitioner, is notoriously unreliable, the only way to make sure it's not a DVT is to get an ultrasound.

"[The Plaintiffs' Counsel]: And is that what the standard of care required under those circumstances?

"[Santore]: Yes.

"[The Plaintiffs' Counsel]: And with respect to—I want you to assume for a moment . . . that the jury will hear evidence that on September 25th [Peter] reported swelling in his calf to [Libby]. Okay, you with me?

"[Santore]: Yes.

"[The Plaintiffs' Counsel]: Under those circumstances, what did the standard of care require [Libby] to do upon learning of calf swelling in [Peter]?

"[The Defendant's Counsel]: Objection, Your Honor, there's no evidence of anybody reporting that to [Libby], whatever.

"[The Plaintiffs' Counsel]: I'm offering that subject to connection tomorrow.

"The Court: All right, we discussed this at sidebar. The objection's overruled.

"[Santore]: The evidence we have is a text message—

"[The Plaintiffs' Counsel]: No, no, hold on a second.

"[Santore]: Oh, sorry.

"[The Plaintiffs' Counsel]: I don't want you to tell me what the evidence is.

"[Santore]: Okay.

"[The Plaintiffs' Counsel]: I want you to assume, okay, the evidence I'm giving you.

"[Santore]: Okay.

"[The Plaintiffs' Counsel]: I want you to assume that there will be evidence before this jury that [Peter] reported to [Libby]—or, I'm sorry, assume that there will be evidence before this jury that [Peter] advised [Libby] on September 25th of a concern of calf pain. Under those circumstances, what did the standard of care require [Libby] to do at that moment?

"[Santore]: Get an ultrasound.

"[The Plaintiffs' Counsel]: I want you to assume there will be evidence presented to this jury that on September 25, [Peter] reported to [Libby] that he was experiencing pain in his calf. Under those circumstances, what

did the standard of care applicable to [Libby] require him to do?

"[Santore]: Pain in the calf is certainly different than pain in the incisional knee area, and so an ultrasound is the only way to exclude a DVT.

"[The Plaintiffs' Counsel]: And you hold those conclusions to a reasonable degree of medical probability.

"[Santore]: I do.

"[The Plaintiffs' Counsel]: And . . . did you reach a conclusion, to [a] reasonable degree of medical probability, as to whether [Libby] met that standard of care?

"[Santore]: Yes.

"[The Plaintiffs' Counsel]: And what is your opinion?

"[Santore]: Unfortunately, he did not."

Just prior to the close of the plaintiffs' case-in-chief, the defendant's counsel raised to the court his belief that the plaintiffs had failed to make good on their promise to introduce evidence supporting the foundational facts asserted in their hypothetical questions to Santore. Particularly, the defendant's counsel argued that the plaintiffs had not produced "one shred of evidence" that Peter had conveyed information to Libby about his calf swelling and pain. The court declined to strike Santore's responses to the hypothetical questions he was asked or to grant any other relief regarding Santore's testimony.[2]

---

[2] Counsel for the defendant never expressly asked the court to strike Santore's testimony at that time. Even assuming that the court understood from the context of their exchange that the defendant's counsel was making an oral motion to strike the testimony, the court seemed to indicate that it would defer any ruling until the defendant could provide the court with a complete record, which the defendant's counsel agreed to provide. Specifically, after the court listened to counsel's renewed concerns about Santore's testimony, the court indicated as follows: "Let me make this easy. I'm going to need to see the—if you're going to make that argument, I have to see the transcript, I need to see both the direct and the cross, all of it, on that point, because you're asking me to remember what was said from your

Turning to the merits of the defendant's claim, we begin with the applicable standard of review and governing principles of law regarding the use of hypothetical questions in eliciting opinion testimony from expert witnesses and a jury's right to draw logical deductions and make reasonable inferences of facts. "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Citation omitted; internal quotation marks omitted.) *Rivera* v. *Saint Francis Hospital & Medical Center*, 55 Conn. App. 460, 468, 738 A.2d 1151 (1999).

Section 7-4 (c) of the Connecticut Code of Evidence provides that "[a]n expert may give an opinion in response to a hypothetical question provided that the hypothetical question: (1) presents the facts in such a manner that they bear a true and fair relationship to each other and to the evidence in the case; (2) is not worded so as to mislead or confuse the jury; and (3) is not so lacking in the essential facts as to be without value in the decision of the case. A hypothetical question need not contain all of the facts in evidence."

perspective. I know [the plaintiffs' counsel] has a different view. I need to see the testimony to see whether or not . . . there's any relief to be accorded based on that." The defendant's counsel agreed to comply with the court's request, although it is unclear from the record whether the defendant did so. Nevertheless, we are persuaded that the present claim was preserved properly for appellate review because, just prior to the charging conference, the defendant "renewed" its request to strike Santore's responses, and the court responded: "I'm not gonna change my ruling on the motion to strike. The motion to strike was denied. I think there was sufficient evidence which [the plaintiffs' counsel] had articulated and I think the court had articulated previously, but if not, it is sufficient to go to the jury on that point."

Although evidence tending to establish the foundational facts on which a hypothetical question is based commonly is admitted prior to calling an expert, the trial court has the discretionary authority to admit responses subject to the later proof of such facts. See Conn. Code Evid. § 7-4 (a), commentary; E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 7.8.1, p. 467. If evidence supporting such facts is not later introduced, however, the trial court, upon request, may order the testimony stricken or instruct the jury not to rely on the expert's response. See Conn. Code Evid. §§ 1-3 (b), commentary, and 7-4 (a), commentary. As with other claims of evidentiary error, we review a trial court's determination regarding both the form of a hypothetical question and the admissibility of any response under the abuse of discretion standard. See *Smith* v. *Andrews*, 289 Conn. 61, 74–75, 959 A.2d 597 (2008), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 91 A.3d 862 (2014).

"[I]t is [the] function of the jury to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . Because [t]he only kind of an inference recognized by the law is a reasonable one . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . However, [t]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the

facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment. . . .

"[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact. . . . Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference. Equally well established is our holding that a jury may draw factual inferences on the basis of already inferred facts." (Internal quotation marks omitted.) *Curran* v. *Kroll*, 303 Conn. 845, 856–57, 37 A.3d 700 (2012).

On the basis of our thorough review of the record, we conclude that the defendant has failed to demonstrate that the court abused its discretion by declining to strike Santore's responses to the plaintiffs' counsel's hypothetical questions on the ground that the hypothetical questions were predicated upon facts never placed in evidence. As recognized by the trial court, there was ample circumstantial evidence presented to the jury from which it reasonably could have inferred that Peter had told Libby about the swelling and pain in his calf. For example, the jury heard testimony from both Peter's son and from Sobin that Peter had been concerned by the pain and swelling in his calf and that he indicated to them that he was going to have his leg examined by Libby. Part of that testimony also included the admission of text messages between the family members and

Peter that corroborated the family's testimony. Furthermore, the discharge instructions that were given to Peter following his knee surgery were submitted into evidence and had instructed Peter to seek medical advice if he experienced pain and swelling because these could be signs of a DVT. There was also testimony that Peter was a "highly compliant" patient. As this court has previously held, it is reasonable for a jury to infer that "persons generally seek to follow instructions of a medical nature concerning . . . serious symptoms . . . ." *Curran* v. *Kroll*, 118 Conn. App. 401, 417, 984 A.2d 763 (2009), aff'd, 303 Conn. 845, 37 A.3d 700 (2012).

The defendant concedes that the family's testimony and other circumstantial evidence was sufficient to support a factual inference that Peter *saw* Libby on September 25 and 28, and, notwithstanding the defendant's argument to the contrary, it would be entirely logical and reasonable for a jury to have drawn the additional inference that, if Peter was concerned enough to have seen Libby, he would have conveyed any potential symptoms of DVT to Libby, including the pain, redness and swelling in his calf. See *Curran* v. *Kroll*, supra, 303 Conn. 857 (it is proper for jury to draw factual inferences on basis of already inferred facts). Finally, Peter told Sobin that Libby had told him to monitor his leg for any *worsening* symptoms, from which the jury could also reasonably infer that Peter had communicated to Libby the symptoms he was experiencing at that time.

In short, we cannot conclude that the trial court abused its discretion when it concluded that evidence was admitted from which the jury could find the foundational facts underlying the hypothetical questions posed to Santore. Accordingly, the defendant's claim fails.

II

The defendant next claims that the court improperly denied its motion for a mistrial, in which it argued

that the plaintiffs' counsel's examination of Libby was unnecessarily inflammatory and intended to unfairly prejudice the jury. In particular, the defendant argues that, during the plaintiffs' redirect examination of Libby, the plaintiffs' counsel improperly implied that Libby had committed a crime or otherwise acted unlawfully when Libby deleted a document from Peter's electronic medical record following his death, referring several times to Libby's actions either as "illegal" or "unlawful." The plaintiffs respond that any impropriety was unintentional and any potential resulting prejudice was cured by the court's subsequent instruction to the jury that there was no claim in this case that Libby's conduct had violated any criminal law and that the jury was not to consider the possibility of a violation of any criminal law in its assessment of his testimony. We agree with the plaintiffs.

The following additional facts and procedural history are relevant to our discussion of this claim. Prior to calling Libby as a witness, counsel for the plaintiffs alerted the court of his intention to question Libby about a document that Libby purportedly had deleted from Peter's electronic medical record. Counsel argued that the deleted medical record was relevant both substantively and for impeachment purposes. The deleted document was admitted as a full exhibit.[3] As the defendant

[3] The admissibility of the deleted record is not at issue on appeal. The defendant took the position that the deleted record was simply a prepopulated form that was generated due to a follow-up evaluation that had been scheduled prior to Peter's death for October 2, 2015. During his pretrial deposition, Libby stated that he had not accessed Peter's medical records after September 15, 2015, but the deleted form contained entries that could not have been prepopulated and thus tended to show that Libby made entries on the electronic form on the morning of October 1, 2015, and then, upon learning of Peter's death, deleted this form. An archived copy of the document nevertheless was retained in the records of the software company that supported the defendant's electronic medical records. In admitting a copy of the deleted form, the court indicated that the plaintiffs could question Libby about the contents of the record but that it was reserving a ruling on how much leeway the plaintiffs would have to question Libby about deleting

concedes in its appellate brief, during the direct examination and cross-examination of Libby, both sides extensively questioned Libby about the deleted document, including the circumstances pertaining to Libby's deletion of it, with only minimal objections. It was not until the plaintiffs' redirect examination of Libby that the plaintiffs' counsel broached the subject matter that forms the basis of the defendant's appellate claim; namely, the legality or lawfulness of Libby's action. The defendant draws our attention to three specific instances in which this occurred.

The plaintiffs' counsel began his redirect by asking: "Mr. Libby, you know that it is illegal to delete a medical record, correct?" Libby answered, "[y]es," before the defendant's counsel objected to the question on the ground that it called for a legal conclusion. The court sustained the objection. Next, after establishing that Libby had received training regarding Connecticut statutes and regulations governing the retention of medical records, the plaintiffs' counsel asked: "[A]nd you know as a result of that training that it is against the law to delete any part of a patient's medical record, correct?" The defendant's counsel again objected, but the court overruled the objection, indicating that Libby could answer if he knew. Libby answered, "[y]es." The plaintiffs' counsel then asked Libby about the testimony he had given earlier in which he suggested he had been trained "to remove notes that were not completed if visits were not completed." Counsel asked: "Nobody at ChartLogic, the software company, ever told you that you could delete medical records that contained unique

---

or removing the record. The court clarified: "So you can take it up to the line of—you can use the postoperative evaluation, you can examine [Libby] about that. The deletion issue, I want to have a sidebar discussion or outside the presence of the jury after I've heard his testimony and then make a determination as to whether it's appropriate, relevant or any other objection that [the defendant] may have at that time."

information on a patient, right?" Libby answered, "[c]or-rect." Counsel then asked: "In fact, you know, as you just testified, that's against the law, correct?" The defendant's counsel objected, and the court sustained the objection. Shortly thereafter, the court adjourned for the day.

The next day, the defendant's counsel informed the court that it intended to file a motion for a mistrial on the ground that the jury had been left with the impression that Libby had done something illegal, which counsel argued was highly prejudicial and highly improper. The defendant argued, as it does on appeal, that the plaintiffs' questions concerning the legality of Libby's deletion or removal from the file of the record in question were calculated to "poison [Libby's] character in front of the jury" and were asked in direct violation of the court's instruction to counsel that matters that had the potential to be controversial should be raised first at a sidebar. The court stated that it understood the defendant's concerns and it would like to "find a way to address the concern with something that is short of a mistrial," such as issuing an instruction to the jury. The court instructed counsel to meet and discuss the issue. On recross-examination, the court permitted the defendant's counsel to ask Libby the following question: "[W]hen you removed the October 1, 2015 draft template for the postoperative initial visit for the total knee arthroplasty did you feel in any way that you were doing something wrong?" Libby responded: "No, I did not."

On April 14, 2023, the defendant elected to file its motion for a mistrial. The defendant stated that "[t]he overwhelming prejudicial effect of [the plaintiffs' counsel's] improper line of questioning warrants a mistrial because it irreversibly has poisoned the proceeding against the defendant on the basis of a demonstrable falsehood, and the defendant thus has been denied its right to a fair trial. If the court nonetheless deems a

mistrial unwarranted, a comprehensive, detailed curative instruction must be given to correct the plaintiffs' counsel's misstatements and improper, false characterization of [Libby's] conduct." The plaintiffs filed an opposition to the motion for mistrial on April 17, 2023. The plaintiffs argued that the motion should be denied because the inquiry into whether Libby had failed to comply with Connecticut and federal legal requirements regarding the maintenance of health records was a fair one because such actions implicated his credibility on other issues, most importantly whether he had seen Peter on September 25 and/or 28; there was no undue prejudice to the defendant; and "[t]he record comes nowhere near the high standard for declaring a mistrial . . . ."

The court heard argument on the motion for a mistrial on April 18, 2023. Following argument, the court issued the following oral ruling: "[T]he court has reviewed the motion for mistrial dated April 14, 2023, as well as the objection to the defendant's motion for mistrial dated April 17, 2023. The court has had several conversations with counsel to discuss a possible curative instruction in lieu of the motion for mistrial, which is a rather drastic last resort that a court would consider if the court does not conclude that a curative instruction would be sufficient. Based on the circumstances of this case where [Libby] was examined by counsel contemporaneously with the questions that defense counsel feels were inappropriate and [Libby] was specifically asked whether he thought he did anything wrong and he said no, and that was before the jury at that time, I don't find that there was any prejudice given.

"It's taken us to get to today to be able to actually have the hearing on the motion for mistrial, although I will say that this was an issue that [was] discussed multiple times. We talked about if the court were to deny the motion, that the court would want to work

on a curative instruction. I instructed counsel to address that issue. I received drafts both in the motion for mistrial as potential alternative in the event that the court denied the motion. I received a version from the defense, I received a version from the plaintiffs, and I had prepared two versions on my own. And based on the law as I understand it, I do not feel that this trial has been inappropriately tainted by the references. I think the court did sustain two objections; the court did not sustain the objection as to . . . one of the questions because it was asking as a result of [Libby's] training, did he understand that it was against the law. So that was the distinction between that ruling and the others, but in any event, I do not find grounds for a mistrial here so I'm going to deny the motion for the reasons stated. And I will issue a curative instruction . . . ."

The court next heard argument from the parties regarding the language of the curative instruction and indicated that it would give an instruction the next day prior to the plaintiffs resting their case. The next day, the court instructed the jury as follows: "Ladies and gentlemen, you may recall that earlier in the trial [Libby] was asked a few questions regarding whether it was illegal, unlawful, or against the law for him to delete or remove a document entitled 'Postop Evaluation,' which was dated October 2, 2015, and the reference is plaintiff's exhibit 26. That testimony related only to issues regarding the preservation of medical records. I'm instructing you that there is no claim in this case that [Libby's] conduct violated any criminal law, and you are not to consider the possibility of any violation of criminal law in your assessment of his testimony. I am further instructing you that no administrative agency has taken any civil action against [Libby] with respect to the deletion or removal of that document." That same

instruction was repeated again during the court's jury instructions prior to deliberations.

"The standard for review of an action upon a motion for a mistrial is well established. [Although] the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances [that] may arise during the trial in which his function is to assure a fair and just outcome. . . . In [our] review of the denial of a motion for mistrial, [we recognize] the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Internal quotation marks omitted.) *Wager* v. *Moore*, 193 Conn. App. 608, 635, 220 A.3d 48 (2019); see also *Ferino* v. *Palmer*, 133 Conn. 463, 466, 52 A.2d 433 (1947) ("[t]he trial court has a wide discretion in passing on motions for mistrial and when the objectionable matter is suitably explained to the jury it is rare that reversible error is found"). "Every reasonable presumption will be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Nevers* v. *Van Zuilen*, 47 Conn. App. 46, 51, 700 A.2d 726 (1997). If the motion for a mistrial is premised on allegedly prejudicial remarks or questions by counsel made during the examination of a witness or during closing argument, "[t]he burden is on the [moving party] to establish that, in the context of the proceedings as a whole, the questions and arguments were so prejudicial that they deprived him of a fair trial." Id., 51–52.

Applying this standard to the present case, we are not convinced that the court abused its discretion by denying the defendant's motion for a mistrial. Any potential prejudice to the defendant resulting from the plaintiffs' counsel's brief questioning of Libby regarding the possible illegality or unlawfulness of his actions with respect to the deleted or removed document was satisfactorily dissipated by the court's clear and concise curative instruction. See id., 52 (any potential prejudice from challenged testimony was cured by court's curative instruction). The court instructed the jury that the issue of whether Libby's conduct violated any criminal or civil law was an issue that was not before the jury and that it should not consider the issue in evaluating his testimony. "It is well settled that the jury is presumed to follow the court's curative instructions in the absence of some indication to the contrary." (Internal quotation marks omitted.) *Modaffari* v. *Greenwich Hospital*, 157 Conn. App. 777, 785, 117 A.3d 508, cert. denied, 319 Conn. 904, 122 A.3d 1279 (2015). No such indication has been provided on appeal.

Given the entirety of the evidentiary record before the jury, the defendant simply has failed to meet its burden of demonstrating that any prejudice arising out of the plaintiffs' counsel's limited examination of Libby regarding the deleted document was the type of occurrence that mandates a mistrial or that any resulting prejudice was not adequately addressed and cured by the trial court's limiting instruction. Because we conclude that the trial court properly exercised its discretion in denying the defendant's motion for a mistrial, we reject the defendant's claim to the contrary.

III

The defendant also claims that the court improperly precluded its medical expert, Richard Iorio, an orthopedic surgeon, from providing opinion testimony regarding the origin and size of the pulmonary embolism that

killed Peter on the ground that the defendant had failed to disclose him properly as an expert with respect to those topics. The plaintiffs dispute the defendant's claim, arguing that Iorio did, in fact, testify that the pulmonary embolism found in Peter's lung was, in his opinion, too large to have originated in the calf as the plaintiffs' expert had testified and that it more likely originated in Peter's pelvis or high thigh. Moreover, the plaintiffs argue that the court only precluded Iorio from testifying about his attempt to measure the size of the embolism on the basis of certain autopsy photographs and that the court provided three grounds for so doing, only one of which was that such testimony was not a properly disclosed opinion. Because the defendant does not address the other two grounds for precluding such testimony in its principal brief, the plaintiffs argue that the defendant's claim is moot. We agree with the plaintiffs that this claim is moot.

The following additional facts are relevant to our disposition of this claim. After the plaintiffs rested their case, the defendant called Iorio as its expert witness regarding the applicable standard of care and causation. Iorio testified to the jury about DVTs generally and how the size of any resulting clot correlates with the size of the vein in which it forms, with veins increasing in size as you move from the foot to the upper thigh and pelvis. Iorio opined that certain studies showed that DVTs significant enough to cause fatal pulmonary embolisms ordinarily do not originate in the lower leg below the knee. Outside the presence of the jury, the plaintiffs' counsel argued to the court that Iorio's testimony regarding how the vascular system functions was beyond the scope of what he was disclosed to testify about, and he orally moved the court to strike some of Iorio's testimony and to preclude him from giving further testimony regarding the vascular system including that "the calf and thigh is incapable of generating a clot of the

size that took [Peter's] life, but the vascular system in the pelvis is." The defendant's counsel objected to the plaintiffs' motion, arguing that, as an experienced orthopedic surgeon with expertise in DVTs, Iorio was more than qualified to testify about the venous system. The court declined to strike any of the testimony Iorio had thus far provided and stated the following about upcoming testimony: "I will take it question by question as we get into issues, for example, about the size of the clot, whether it could've gone through—how do we know what the size was, whether it went through a particular vein, whether it can only have gone through something that originated in the pelvis or something else. We're going to take them question by question. If there are issues, we'll have sidebars and we'll figure it out. But this is not to be understood that I haven't stricken the testimony to say that he's going to have free rein to testify about everything having to do with where the clot may have originated. All right?"

Iorio's direct testimony resumed. The defendant's counsel eventually turned to questions about the autopsy report and two photographs that Iorio had reviewed that purportedly depicted the pulmonary embolism at issue. The photographs were not in evidence, the defendant's counsel having only marked them for identification purposes. The plaintiffs' counsel objected to the admissibility of the photographs on the ground that they had not been previously disclosed to the plaintiffs and had not been properly authenticated.[4]

---

[4] The plaintiffs' counsel argued as follows: "What they're proposing to do now through a witness who has no personal knowledge of these photographs is to have him identify what they are, from where they came, and what they depict. And he's going to now base his opinion that this particular embolus could not have arisen in the lower extremity based on something that appears in the photo, which I understand to be dimensions. Again, we haven't looked at these photos prior to today. The witness has no personal knowledge about it. He cannot authenticate a document about which he has no personal knowledge. . . . [E]ven if there was proper authentication as to what this picture actually depicts, it would be overly prejudicial given the lack of explanation from the pathologist himself on the issue and given the lack of

The defendant's counsel responded that it was the plaintiffs' obligation to ensure that they had received all autopsy photographs along with the autopsy report and that the photographs were self-authenticating because the photographs contained a specimen number that corresponded with the autopsy report.[5]

After hearing additional arguments regarding the admissibility of the photographs and their use by Iorio in his testimony to the jury, the court made the following ruling: "The photographs are not coming into evidence. I don't think there's a sufficient evidentiary basis for it. I also think they're potentially inflammatory to the jury. But that raises a separate issue, which is about the expert opinion and whether or not [Iorio] will be able to offer opinions with respect to the size of the emboli based on the photographs. He'll be able to

notice to us on this issue. So it's not admissible and none of his opinions that rely upon it, and in particular his opinions on the dimensions of the embolus itself, which they've obviously been trying to set up by having him describe the dimensions of the venous system, should be admissible."

[5] More specifically, the defendant's counsel argued as follows: "[I]t's actually the plaintiff's obligation to provide us these things in the first instance. The fact that [the plaintiffs' counsel] didn't have them, if that's what he's representing, you know, that's up to him to get the entirety of the autopsy report if that's what he wants. But nobody was hiding anything from anybody and he didn't ask [Iorio] at his deposition whether he had reviewed autopsy photos or anything along those lines. And with regard to the photos themselves . . . the photographs are self-authenticating because on the photographs it corresponds with the specimen number of the autopsy for [Peter] . . . . The idea as to where the clot originated and the size of it and all that other stuff, you know, obviously [Iorio] was gonna come in here and testify about that. At [Iorio's] deposition the questions were really brief about it. Basically, they were, [Iorio], is it your opinion that the clot arose from either the thigh or the pelvis, or something like that. He said yes. . . . And there were no questions about the venous system, tell me what the size of the clot was, or anything along those lines. So, they had every right to explore with him whatever it was he was relying on in testimony about it. And they didn't. And then to come in here and say . . . it hasn't been disclosed or we didn't know, it's not my obligation to go get your photographs. These guys have been doing this for a long time. They know almost with every autopsy there are photographs. . . . We had no reason to believe that they didn't have them."

offer—you can ask him those question[s] based on what he reviewed. He can say, I reviewed photographs. Did you take any measurements yourself? No, I—there was a scale on a photograph and I used that to measure and this is my estimate, and that's his opinion. . . . And then he'll be crossed on it." The plaintiffs' counsel then raised several additional objections. First, he argued that, at the time of Iorio's deposition, the plaintiffs had requested disclosure of any materials upon which Iorio would be relying in support of his opinions and the photographs at issue were never disclosed until trial. Second, he argued that Iorio was an orthopedic surgeon, not a pulmonologist, and he was never disclosed to testify as an expert regarding lung structures or the measuring of a clot within the lung. The defendant's counsel responded that Iorio had the necessary expertise and that "there's no reason" to preclude his testimony.

The court responded: "Well, there's several—there are several reasons to keep it out. One was the disclosure issue; the second is he's not a pulmonologist . . . and it's not a disclosed opinion." After hearing additional argument from the parties, the court agreed to allow the defendant to examine Iorio for the limited purpose of making an offer of proof "as to why [Iorio] as opposed to a pulmonologist or a vascular surgeon is the appropriate person to talk about the measurements of the emboli . . . as depicted in the photographs." Following that offer of proof, and after hearing additional argument, the court ruled that Iorio could testify that, consistent with the medical examiner's report, the embolus that killed Peter was large, and on the basis of that and on the basis of his training, research and experience, it was his opinion that it had originated someplace other than from Peter's calf or lower leg. The court stated, however, that Iorio "can't testify about

what the size was based on the photographs, based on the undisclosed opinion."

Having reviewed the entirety of Iorio's testimony, we agree with the plaintiffs that the only real limitation that the court placed on his testimony was with respect to his use of the autopsy photographs as a basis for providing an opinion as to the precise measurement of the embolus found in Peter's lung. The court provided the defendant with three reasons for excluding this testimony. First, the autopsy photographs on which such testimony would have been based were deemed inadmissible, both because of a lack of authentication of the photographs and because they were never properly disclosed to the plaintiffs. Second, the court concluded that Iorio had not established that he was qualified to provide expert testimony about what was depicted in the autopsy photographs because he was neither a pulmonologist nor a pathologist. Third, the court indicated that it agreed with the plaintiffs that Iorio's disclosure as an expert did not include providing testimony regarding measuring the size of an embolus from autopsy photographs.

"[I]t is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way. . . . [If] alternative grounds . . . unchallenged on appeal would support the trial court's judgment, independent of some challenged ground, the challenged ground that forms the basis of the appeal is moot because the court on appeal could grant no practical relief to the complainant." (Citation omitted; internal quotation marks omitted.) *State* v. *Abushaqra*, 151 Conn. App. 319, 325, 96 A.3d 559 (2014).

On appeal, the defendant has only challenged the court's limitation of Iorio's testimony by arguing that the court was incorrect about the scope of his disclosure as an expert pursuant to Practice Book § 13-4, which the defendant argues does not require a party to disclose an exhaustive list of the specific topics about which an expert may testify. We need not reach this issue, however, because the defendant has failed to address the court's other independent bases for limiting Iorio's testimony; namely, his lack of qualifications to testify regarding subject matters outside his area of expertise and the defendant's purported failure to disclose to the plaintiffs the photographs that would have formed the basis for his opinion. Because we cannot provide any practical relief by reviewing only one of the court's reasons underlying the court's decision to partially limit Iorio's testimony, we dismiss the defendant's claim as moot.[6]

## IV

Finally, the defendant claims that the court improperly instructed the jury that, in assessing the damages to award for wrongful death, the jury could award damages for the "death itself." The defendant essentially argues that any damages awarded for the death itself in the present case would have been cumulative of

---

[6] Even if we were to agree with the defendant that the court improperly prevented Iorio from testifying to the jury regarding his precise measurement of the embolus found in Peter's lung, the defendant would not be entitled to the relief it seeks because we are unconvinced that the exclusion of such evidence was harmful in light of our review of the totality of the evidence presented. The autopsy report admitted into evidence described the embolus as "large" and Iorio was able to provide the jury with his opinion that an embolus large enough to result in Peter's death could not have originated from a DVT in Peter's calf as opined by the plaintiffs' expert. It is apparent from the jury's verdict that they believed the plaintiffs' expert over the defendant's expert as to causation, and the defendant simply has failed to show that any excluded testimony was reasonably likely to have altered that outcome.

other noneconomic damages and that, consistent with Connecticut's model jury instructions on damages for wrongful death, the plaintiffs were entitled to damages for "either the death itself or for pain and suffering, not both." We do not agree.

The following additional facts are relevant to our review of this claim.[7] The day before closing arguments, the court conducted an off the record charge conference in chambers. The court later gave the jury the following charge with respect to noneconomic damages: "In this case the estate is claiming noneconomic damages. Noneconomic damages are money damages awarded as compensation for nonmonetary losses and injuries which [Peter] suffered as a result of the defendant's negligence. They are awarded for such things as physical pain and suffering and the destruction of the ability to enjoy life's pleasures.

"We have a statute that governs damages in cases such as this where there is a death. It allows for just damages, including damages consisting of compensation for the destruction of [Peter's] capacity to carry on and enjoy life's activities in a way that he would have done had he lived; compensation for the death itself; and pain and suffering.

---

[7] In his closing argument, counsel for the plaintiffs gave the following brief description of what damages for "death itself" entail: "The next is damages for death itself. And this is the recognition that every human life, every human life, no matter how old you are, young you are, rich, poor, disabled, able-bodies, health problems, no health problems, life has a certain baseline value. And the fact that it was taken from Peter is a form of damage that if you find we've proven our case you're required to provide. What is the value of a life extinguished? Five million? Ten million? How much? The value of a life extinguished. Any life, no matter how great your life is, how fortunate you've been, how unfortunate you've been, what is the baseline value of a life, that's that."

The defendant's counsel, in his closing argument, provided no guidance regarding the proper measure of damages. Rather, he stated only: "So with regard to damages, you cannot . . . guess or speculate as to anything. And what we ask is that you use your common sense."

"Damages are allowed for the destruction of [Peter's] capacity to enjoy life's activities. Evidence has been presented as to those incidents of life that [Peter] enjoyed, including family, work, sports, recreation and other aspects of life. You may consider those areas in connection with this claim and award damages for this loss.

"The rule is that insofar as money can do it, the estate may be awarded for fair, just and reasonable compensation for [Peter's] loss of life. As in the other categories of damages, there is no precise mathematical formula for a jury to apply.

"The estate also seeks to recover damages for physical pain and suffering and emotional upset and anguish on October 1, 2015. A plaintiff who is injured by the negligence of another is entitled to be compensated for all physical pain and suffering, emotional upset and anguish, and loss of the ability to enjoy life's pleasures that the plaintiff proves by a fair preponderance of the evidence to have been proximately caused by the defendant's negligence. As far as money can compensate the estate for such injuries and their consequences, you must award a fair, just and reasonable sum. You simply have to use your own good judgment in awarding damages in this category. You should consider the nature and duration of any pain and suffering that you find."

After the court charged the jury, the court inquired whether the parties had any objections to the charge as it was delivered and allowed counsel to make a record of their objections raised earlier during the charge conference. With respect to the instruction on damages, the defendant's counsel indicated as follows: "We take exception to the inclusion of the separated and identified claim of damage . . . for compensation for death itself. As we've argued and stated in our

papers, that's not part of the statute that's applicable to wrongful death and that's not an appropriate charge, in our—that's our position." The court responded: "That's in the standard instructions. Right?" The defendant's counsel acknowledged: "Yes, Your Honor."

We begin with our standard of review and other relevant principles of law. "When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Instructions are adequate if they give the jury a clear understanding of the issues and proper guidance in determining those issues." (Internal quotation marks omitted.) *Perez* v. *Cumba*, 138 Conn. App. 351, 366, 51 A.3d 1156, cert. denied, 307 Conn. 935, 56 A.3d 712 (2012).

"The wrongful death statute; General Statutes § 52-555; is the sole basis upon which an action that includes as an element of damages a person's death or its consequences can be brought. At common law, the death of the injured person, whether contemporaneous with the wrongful act or not, terminated liability of the wrongdoer because the right to enforce it ended with the death. . . . Death and its direct consequences can constitute recoverable elements of damages only if, and to the extent that, they are made so by statute. . . . Because it is in derogation of the common law, an action for wrongful death is limited to matters clearly within

its scope." (Citations omitted.) *Lynn* v. *Haybuster Mfg.*, *Inc.*, 226 Conn. 282, 295, 627 A.2d 1288 (1993).

Section 52-555 provides in relevant part: "In any action surviving to or brought by an executor or administrator for injuries resulting in death, whether instantaneous or otherwise, such executor or administrator may recover from the party legally at fault for such injuries just damages together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses . . . ." Our Supreme Court has stated that " '[j]ust damages' include (1) the value of the decedent's lost earning capacity less deductions for her necessary living expenses and taking into consideration that a present cash payment will be made, (2) compensation for the destruction of her capacity to carry on and enjoy life's activities in a way she would have done had she lived, and (3) compensation for conscious pain and suffering." *Sanderson* v. *Steve Snyder Enterprises, Inc.*, 196 Conn. 134, 149 n.12, 491 A.2d 389 (1985).

That damages for the "death itself" are also recoverable in an action for wrongful death was confirmed by our Supreme Court's decision in *Floyd* v. *Fruit Industries, Inc.*, 144 Conn. 659, 136 A.2d 918 (1957). In *Floyd*, the court stated: "Damages for wrongful death, as such, are allowed as compensation for the destruction of the decedent's capacity to carry on life's activities, including his capacity to earn money, as he would have if he had not been killed. . . . In the case of one who is gainfully employed, especially one who earns a relatively large income, as did the present decedent, the destruction of earning capacity may well be the principal element of recovery resulting from the death. . . . But we have consistently pointed out that damages for wrongful death are not restricted to those arising from the mere destruction of earning capacity. Some damages are recoverable *for death itself*, even though

instantaneous, without regard to earnings or earning capacity." (Citations omitted; emphasis added.) Id., 669–70.

The defendant argues that damages for the "death itself" were intended to act as a "stop gap" measure to be utilized only in those cases in which "there is no claim of antemortem damages or no claim of postmortem damages." The defendant cites to no appellate case law post-*Floyd* that expressly interprets Connecticut law in this manner. Rather, the defendant draws our attention to the model civil jury instruction on damages for wrongful death, which provides in relevant part: "We have a statute that governs damages in cases such as this where there is a death. It allows for just damages which includes: [e]conomic damages of: 1) the reasonable and necessary medical and funeral expenses and 2) the value of the decedent's lost earning capacity less deductions for (his/her) necessary living expenses taking into consideration that a present cash payment will be made and [n]oneconomic damages of: 3) compensation for the destruction of the decedent's capacity to carry on and enjoy life's activities in a way that (he/she) would have done had (he/she) lived and, 4) compensation for the death itself, *or* 5) pain and suffering." (Emphasis added.) Connecticut Civil Jury Instructions 3.4-7, available at http://jud.ct.gov/JI/Civil/Civil.pdf (last visited August 20, 2025). The defendant argues that we must construe the model instruction's use of the conjunction "or" between "death itself" and "pain and suffering" as an acknowledgment by the drafters that a party may not recover damages for the death itself *and* for pain and suffering.

As a preliminary matter, we note that Connecticut's civil model jury instructions, as published on the Judicial Branch website, are only intended as a guide and that their publication is no guarantee of their legal correctness or adequacy. See *Snell* v. *Norwalk Yellow Cab*,

*Inc.*, 332 Conn. 720, 761–63, 212 A.3d 646 (2019). "The language used in the model jury instructions, although instructive in considering the adequacy of a jury instruction . . . is not binding on this court." (Citation omitted; internal quotation marks omitted.) Id., 762.

Moreover, subsequent portions of the very same model instruction relied on by the defendant suggest that a plaintiff is entitled to recover for the death itself, i.e., for the loss of life, and, "[i]n the event the death was not instantaneous," also recover for antemortem pain and suffering.[8] Connecticut Civil Jury Instructions, supra, 3.4-7. The instruction seems to suggest that only if a death is instantaneous would a plaintiff's damages be limited to compensation for the death itself, presumably because there could not have been any antemortem pain and suffering. If the death was not instantaneous, the model instruction directs the court to also instruct the jury as to damages for pain and suffering utilizing the same instruction for calculating such damages applicable in other tort actions. There would be no need for such an instruction if damages for pain and suffering

[8] In the section of the instructions that provides more detailed discussion of each measure of noneconomic damages, the model instructions provide: "Now I will instruct you on noneconomic damages.

"3. Destruction of Capacity to Enjoy Life's Activities

"Damages are also allowed for the destruction of (Mr./Ms.) <name of decedent>'s capacity to enjoy life's activities.

"Evidence has been presented as to those incidents of life that (Mr./Ms.) <name of decedent> enjoyed, including family, work, sports, recreation and other aspects of life. You may consider those areas in connection with this claim and award damages for this loss.

"4. Compensation for the Death Itself

"The rule is that insofar as money can do it, the plaintiff may be awarded fair, just and reasonable compensation for the loss of life. As in the other categories of damages, there is no precise mathematical formula for a jury to apply.

"5. Pain and Suffering

"<In the event the death was not instantaneous, see relevant portions of Damages—General, Instruction 3.4-1.>" Connecticut Civil Jury Instructions, supra, 3.4-7.

were subsumed within damages for the death itself as suggested by the defendant.

The notion that a plaintiff may receive damages for both the death itself and for any pain and suffering that preceded the death is also consistent with our Supreme Court's explanation in *Floyd* that the wrongful death cause of action "is a continuance of [the cause of action that] the decedent could have asserted had he lived . . . . Our wrongful death statute *adds* to that cause of action, as an element of damage, the death itself, which was not recognized as an element of damage at common law." (Citations omitted; emphasis added; internal quotation marks omitted.) *Floyd* v. *Fruit Industries, Inc.*, supra, 144 Conn. 668; see also *Kling* v. *Torello*, 87 Conn. 301, 306, 87 A. 987 (1913) (explaining that Connecticut's wrongful death statute "operates to transfer to the representative the right of action [that] the deceased had for his sufferings and disability during life, while the death *enlarges his right of recovery* by permitting an award of *additional damages for the death itself* as one of the harmful results of the wrongful act" (emphasis added)).

Lastly, even if the defendant had convinced us, which it does not, that the court's instruction regarding the measure of damages was improper because it would have permitted the jury to award duplicative damages for pain and suffering and for the "death itself," we agree with the plaintiffs that the defendant's claim would nevertheless fail because the defendant cannot demonstrate any harm on the basis of the record before us. The court only instructed the jury that it may, not must, award damages for the death itself. Furthermore, the jury was not asked to complete a jury interrogatory or to otherwise provide an accounting regarding the components of its award of noneconomic damages, nor did the defendant request the same in its proposed jury interrogatories and verdict forms. Accordingly, there is

nothing in the record before us showing that the jury awarded damages for the death itself or that it did so in addition to awarding damages for pain and suffering. This court cannot and will not engage in speculation in evaluating an award of damages. See *Day* v. *Gabriele*, 101 Conn. App. 335, 347–48, 921 A.2d 692, cert. denied, 284 Conn. 902, 931 A.2d 262 (2007).

Having considered all of the arguments of the parties, and on the basis of our careful review of the case law cited, we are convinced that the court's instructions regarding damages were properly adapted to give the jury a clear understanding of the issues before it and proper guidance in determining an award of damages. Accordingly, the defendant's claim of instructional error fails.

AC 46730

V

In the second appeal, the plaintiffs appeal from the judgment of the trial court denying in part the plaintiffs' motion for offer of compromise interest. Specifically, they challenge the court's refusal to award offer of compromise interest on the full amount of the judgment, including Sobin's loss of consortium damages. We are not persuaded.

The following additional facts are relevant to this claim. On March 12, 2019, Sobin, in her capacity as the administratrix of Peter's estate, filed an offer of compromise with the court. The offer of compromise stated in relevant part: "Pursuant to [General Statutes §] 52-192a,[9] *the plaintiff, Linda Sobin, administratrix*

[9] General Statutes § 52-192a provides in relevant part: "(a) Except as provided in subsection (b) of this section, after commencement of any civil action . . . seeking the recovery of money damages . . . the plaintiff may . . . file with the clerk of the court a written offer of compromise signed by the plaintiff or the plaintiff's attorney, directed to the defendant or the defendant's attorney, offering to settle the claim underlying the action for a sum certain. . . . Within thirty days after being notified of the filing of the offer of compromise and prior to the rendering of a verdict by the jury

*of the estate of Peter Sobin*, in the above-entitled matter, hereby makes an offer of compromise to settle with [the defendant] in the amount of [$1 million], which offer constitutes *the plaintiff's* offer to settle the claim underlying the above-captioned action against [the defendant] and further constitutes the plaintiff's willingness to stipulate to a judgment for the sum of [$1 million] against said defendant . . . ." (Emphasis added; footnote added.) The offer of compromise was signed by counsel on behalf of "the plaintiff" and did not include any reference to Sobin in her individual capacity or to her loss of consortium claim. The defendant did not object to the offer of compromise or seek clarification of its terms nor did it seek any additional time to respond. Because the defendant failed to accept the offer of compromise within the sixty day acceptance

or an award by the court, the defendant or the defendant's attorney may file with the clerk of the court a written acceptance of the offer of compromise agreeing to settle the claim underlying the action for the sum certain specified in the plaintiff's offer of compromise. Upon such filing and the receipt by the plaintiff of such sum certain, the plaintiff shall file a withdrawal of the action with the clerk and the clerk shall record the withdrawal of the action against the defendant accordingly. If the offer of compromise is not accepted within thirty days and prior to the rendering of a verdict by the jury or an award by the court, the offer of compromise shall be considered rejected and not subject to acceptance unless refiled. . . .

(b) In the case of any action to recover damages resulting from personal injury or wrongful death . . . in which it is alleged that such injury or death resulted from the negligence of a health care provider, the plaintiff may, not earlier than three hundred sixty-five days after service of process is made upon the defendant in such action, file with the clerk of the court a written offer of compromise pursuant to subsection (a) of this section and, if the offer of compromise is not accepted within sixty days and prior to the rendering of a verdict by the jury or an award by the court, the offer of compromise shall be considered rejected and not subject to acceptance unless refiled.

(c) After trial the court shall examine the record to determine whether the plaintiff made an offer of compromise which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain specified in the plaintiff's offer of compromise, the court shall add to the amount so recovered eight per cent annual interest on said amount . . . ."

period, the offer was deemed rejected as a matter of law pursuant to § 52-192a (b). The plaintiffs did not refile or submit any other offer of compromise.

On May 4, 2023, after the jury returned its verdict in favor of the plaintiffs, the plaintiffs, collectively, filed a motion pursuant to § 52-192a and Practice Book § 17-18, asking the court to examine the record, to award offer of compromise interest, and to add such interest to the amount of the judgment. The defendant filed an objection to the plaintiffs' motion for assessment of offer of compromise interest on two grounds. First, it argued that the March 12, 2019 offer of compromise "was facially invalid" because, rather than being an offer "to settle the claim underlying the action for a sum certain," it was an offer "to stipulate to a judgment," which is at odds with the language of § 52-192a requiring a withdrawal of the action. (Internal quotation marks omitted.) Second, the defendant argued that, even if the court deemed the offer of compromise valid, it was not applicable with respect to the loss of consortium damages because the offer of compromise was only made on behalf of Sobin in her representative capacity, not by Sobin individually. The plaintiffs responded that the court should view the offer of compromise as having sought to settle the entire case because the loss of consortium count was derivative of the wrongful death count and settlement of the wrongful death case would have necessarily resolved the loss of consortium count.

The trial court conducted a hearing regarding costs, postjudgment interest, and offer of compromise interest, following which it issued an order awarding offer of compromise interest but only with respect to the wrongful death count. The court indicated in its order that it had set forth the basis for its decision on the record. After this appeal was filed, the court issued the following order in response to a motion for articulation filed by the plaintiffs that asked the court to specify

the pages and line numbers of the transcript of the hearing that contained the court's factual and legal basis for its decision: "The transcript of the July 10, 2023 hearing regarding offer of compromise interest contains the factual and legal basis upon which the court rendered its decision . . . awarding offer of compromise interest to [Sobin], administratrix of the estate of Peter Sobin (and declining to award offer of compromise interest to [Sobin] in her individual capacity) at the following lines and pages: 24:2-7, 26:10-20, 29:8-10, 29:22-30:4, 30:15-27, 31:10-15, 31:25-32:11, 32:21-33:5, 33:8-13, and 33:26-34:3." Neither party filed a motion asking this court to review the court's articulation.

Having reviewed those portions of the transcript referenced by the trial court, we conclude that the court unequivocally rejected the defendant's argument that the offer of compromise contained conditional language that rendered the offer of compromise facially invalid,[10] but it appears to have credited the defendant's argument that the offer of compromise was only filed on behalf of the plaintiff estate and not on behalf of Sobin individually and, as such, was inapplicable to her.[11]

___

[10] The court explained: "[F]ocusing on . . . the specific language that was used . . . [the offer of compromise is] not conditioned on stipulating to a judgment. It's a willingness to stipulate. So, as I read it, there are two paths that one might go based on this offer. One is to accept the offer as a settlement. The other is to accept this and enter into a stipulation. There's no requirement, as I read that language, that it is both. That you have to agree to settle for a million dollars and stipulate to a judgment." The court further ruled, in the alternative, that "[i]f there were any ambiguities in the offer as far as the [defendant] was concerned, the [defendant] had a number of opportunities to address this. One, file an objection; two, file a motion to strike it; three, file some other motion with the court asking the court to either have a status conference or somehow to engage and figure out what does this really mean, ask for an extension [of] time to do some analysis, look at case law, but the [defendant] didn't do anything. There was no acceptance. There was no rejection. There was silence . . . ."

[11] None of the record citations provided by the trial court in its articulation seems to provide direct insight regarding the court's reasoning with respect to this argument, although there is some indication that the court credited the arguments of the defendant.

"Our courts have consistently held that prejudgment interest is to be awarded by the trial court [if] a valid offer of judgment is filed by the plaintiff, the offer is rejected by the defendant, and the plaintiff ultimately recovers an amount greater than the offer of judgment after trial. . . . Moreover, an award of interest under § 52-192a is mandatory, and the application of § 52-192a does not depend on an analysis of the underlying circumstances of the case or a determination of the facts. . . . The statute is admittedly punitive in nature. . . . It is the punitive aspect of the statute that effectuates the underlying purpose of the statute and provides the impetus to settle cases. . . .

"The purpose of § 52-192a is to encourage pretrial settlements and, consequently, to conserve judicial resources. . . . [T]he strong public policy favoring the pretrial resolution of disputes . . . is substantially furthered by encouraging defendants to accept reasonable offers of judgment. . . . Section 52-192a encourages fair and reasonable compromise between litigants by penalizing a party that fails to accept a reasonable offer of settlement. . . . In other words, interest awarded under § 52-192a is solely related to a defendant's rejection of an advantageous offer to settle before trial and his subsequent waste of judicial resources. . . . Of course, the partial settlement of a case does little for the conservation of our limited judicial resources. Accordingly, the ultimate goal in a multiparty lawsuit is the fair and reasonable settlement of the case on a global basis." (Citation omitted; internal quotation marks omitted.) *Cardenas* v. *Mixcus*, 264 Conn. 314, 321, 823 A.2d 321 (2003). "The question of whether the trial court properly awarded [offer of compromise] interest pursuant to § 52-192a is one of law subject to plenary review." (Internal quotation marks omitted.) *Barton* v. *Norwalk*, 163 Conn. App. 190, 216, 135 A.3d 711 (2016), aff'd, 326 Conn. 139, 161 A.3d 1264 (2017).

Here, Sobin in her individual capacity was not named as a party to the offer of compromise nor was it signed by her or on her behalf. Sobin in her representative capacity as the administratrix of Peter's estate has fiduciary responsibilities and legal interests that are separate and distinct from her interests as an individual plaintiff. Certainly, the estate lacked any legal authority to settle or enter into an offer of compromise with respect to a cause of action brought by Sobin individually. The plaintiffs nevertheless argue that the court should have treated the offer of compromise as if it also was filed on behalf of Sobin in her individual capacity because her loss of consortium claim is wholly derivative of the wrongful death count asserted on behalf of the estate. See *Voris* v. *Molinaro*, 302 Conn. 791, 797, 31 A.3d 363 (2011) ("settlement of the predicate [injury] claim extinguishes the derivative claim for loss of consortium"); *Izzo* v. *Colonial Penn Ins. Co.*, 203 Conn. 305, 312, 524 A.2d 641 (1987) ("[l]oss of consortium, although a separate cause of action, is not truly independent, but rather derivative and inextricably attached to the claim of the injured spouse").

We agree with the trial court that the significant legal consequences of the defendant's failure to accept the offer of compromise should not accrue with respect to the loss of consortium count. The derivative nature of the cause of action asserted by Sobin in her individual capacity is not a sufficient basis to overcome the clear pleading deficiencies with the offer of compromise. Even if the loss of consortium would likely have been resolved by operation of law upon settlement and withdrawal of the wrongful death action; see *Voris* v. *Molinaro*, supra, 302 Conn. 797–98; given the punitive nature of the offer of compromise statute, it is appropriate to strictly construe any such offers, and we believe it would be untenable to penalize a defendant for not agreeing to an offer of compromise with respect to a

cause of action that was never mentioned in the offer of compromise and in favor of a party that was not a party to the offer. Accordingly, we reject the plaintiffs' claim.

## VI

Finally, in its cross appeal, the defendant claims that the court should not have awarded any offer of compromise interest because the purported offer of compromise was invalid. The defendant points to the fact that, in the offer of compromise, the plaintiff estate indicated that it would be willing to "stipulate to a judgment," which the defendant argues is improper under § 52-192a because "the modern offer of compromise statute clearly states that the agreements are not judgments, but settlements, and that the plaintiff 'shall' withdraw the action after it is accepted by the defendant." The defendant contends that it could not have accepted the offer of compromise under § 52-192a because it was not a valid offer pursuant to the statute and thus the court should not have penalized it by awarding offer of compromise interest. We reject the defendant's claim for the reasons set forth by the trial court.

At issue is the proper construction of the following highlighted language in the offer of compromise: "The plaintiff . . . hereby makes an offer of compromise to settle with [the defendant] in the amount of [$1 million], which offer constitutes the plaintiff's offer to settle the claim underlying the above-captioned action against [the defendant] *and further constitutes the plaintiff's willingness to stipulate to a judgment for the sum of* [*$1 million*] *against said defendant . . . .*" (Emphasis added.) Although the defendant insists, as it did before the trial court, that the inclusion of the emphasized language effectively conditioned any acceptance of the offer of compromise on the defendant's agreement to stipulate to a judgment in favor of the plaintiff estate,

we reject that interpretation. Rather than condition the settlement offer on the acceptance of a stipulated judgment, we read the additional language as indicating the plaintiff estate's willingness, *as an alternative to the offer of compromise*, to enter into a stipulated judgment.[12] Thus, as the court indicated on the record, "there are two paths that one might go based on this offer. One is to accept the offer as a settlement. The other is to accept this and enter into a stipulation."

The defendant has cited no appellate legal authority that an offer of compromise is rendered invalid if, in addition to agreeing to settle the matter for a sum certain, it also includes an alternative offer to reach a stipulated judgment. Moreover, such a result is not mandated by any language in § 52-192a. Because we conclude that the offer of compromise was not rendered invalid because of the inclusion of the language indicating the plaintiff estate's willingness, in the alternative, to reach a stipulated judgment, the defendant's claim to the contrary fails.

The judgments are affirmed.

In this opinion the other judges concurred.

———————

[12] It is unclear from the record why the plaintiff estate elected to include such language in the offer of compromise, but those motivations are not germane to our consideration of this claim.